IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAMKUMAR RAYAPUREDDY,<br><br>Defendant. | CRIMINAL NO. 22- 285<br><br>18 U.S.C. § 371<br>15 U.S.C. §§ 78j(b) and 78ff<br>17 C.F.R. §§ 240.10b-5 and 240.10b5-2<br>18 U.S.C. § 2 |

## INDICTMENT

The Grand Jury charges:

FILED

NOV 09 2022

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

### GENERAL ALLEGATIONS

**Relevant Individuals and Entities**

At all times relevant to this Indictment, unless otherwise stated:

1. Mylan N.V. ("Mylan") was a pharmaceutical company headquartered in Canonsburg, Pennsylvania, within the Western District of Pennsylvania. Mylan was a publicly traded company with shares listed on the NASDAQ exchange, a national securities exchange, under the ticker "MYL," and was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934. In or around November 2020, Mylan merged with Upjohn, a division of Pfizer, Inc. ("Pfizer").

2. The defendant, RAMKUMAR RAYAPUREDDY, was a resident of Upper Saint Clair, Pennsylvania. In or around September 2014, RAYAPUREDDY was hired by Mylan as the Head of Information Technology ("IT") Operations. On or about January 1, 2016, Mylan promoted RAYAPUREDDY to be Mylan's Chief Information

Officer ("CIO"). In his role as CIO, RAYAPUREDDY oversaw Mylan's IT Department. As an officer and employee of Mylan, RAYAPUREDDY owed Mylan a duty of trust and confidence.

3. Dayakar Mallu ("Mallu") was an employee in Mylan's IT Department from in or around 2011 until his termination in or around March 2017.

### Overview of Options

4. A call option provides the buyer with the right, but not the obligation, to purchase shares of the underlying security at a specified price (the "strike price") on or before the option's expiration date. The purchaser of a call option stands to benefit from an increase in the price of the underlying security.

5. A call option is considered "in the money" when the strike price of the option is below the market price of the underlying security. In this scenario, the holder of the option could purchase the underlying security at a below-market price by exercising the option.

6. A put option provides the seller with the right, but not the obligation, to sell shares of the underlying security at the strike price on or before the option's expiration date. The purchaser of a put option stands to benefit from a decrease in the price of the underlying security.

7. A put option is considered "in the money" when the strike price of the option is above the market price of the underlying security. In this scenario, the holder of the option could sell the underlying security at an above-market price by exercising the option.

8. The holder of a call or put option can sell the option at any time up to its expiration date without ever exercising the option. If a call or put option is "out of the money" at the time of expiration, the option becomes worthless and the holder of the option at that time loses the entire amount invested in the option.

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

9. Paragraphs 1 through 8 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

10. From at least in or around September 2017 through on or about July 29, 2019, in the Western District of Pennsylvania and elsewhere, the defendant,

**RAMKUMAR RAYAPUREDDY**,

did knowingly and intentionally, that is, with the intent to advance the conspiracy, combine, conspire, and agree with Mallu and other individuals, known and unknown, to commit an offense against the United States, namely, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, that is, to knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ, and cause others to use and employ, manipulative and deceptive devices and contrivances, by (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in

order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons; to wit, RAYAPUREDDY agreed to, and did, misappropriate material non-public information belonging to Mylan and provide that information to Mallu so that Mallu would use that information to trade in the securities of Mylan and share the proceeds with RAYAPUREDDY.

### Purpose of the Conspiracy

11. The purpose of the conspiracy to commit securities fraud was for RAYAPUREDDY and Mallu to fraudulently and unlawfully profit from purchasing and selling Mylan securities based on material non-public information regarding Mylan that RAYAPUREDDY obtained through his position at Mylan and to conceal the conspiracy.

### Manner and Means of the Conspiracy

12. In furtherance of the conspiracy, and to accomplish its purpose, RAYAPUREDDY, Mallu, and other individuals, known and unknown, used the following methods, manner, and means:

    a. RAYAPUREDDY, in his role as Mylan's CIO, acquired and misappropriated material non-public information relating to the status of Mylan's drug applications with the U.S. Food and Drug Administration ("FDA"), Mylan's earnings results and forthcoming announcements, and a merger.

b.  RAYAPUREDDY provided Mallu with this material non-public information expecting that Mallu would use the information to execute favorable trades in Mylan securities, and further expecting to receive benefits in return, including cash payment kickbacks.

c.  Utilizing the information provided by RAYAPUREDDY, Mallu traded in Mylan's securities, at times with significant profits and avoided loses.

d.  Mallu gave, and RAYAPUREDDY accepted, direct and indirect cash payments that represented a portion of the unlawful trading profits in Mylan's securities. RAYAPUREDDY and Mallu engaged in cash transactions in foreign currency, used trusted intermediaries to deliver the cash in a foreign country, and used encrypted methods of communication to conceal the illegal nature of, and profits from, their conspiracy.

### *Insider Trading Surrounding Mylan's Announcement of FDA Approval for New Drugs*

e.  For example, RAYAPUREDDY tipped Mallu with material non-public information regarding the status of Mylan's FDA drug applications, including regarding anticipated FDA approval of Mylan's Abbreviated New Drug Applications ("ANDAs") for Glatiramer Acetate Injections, a substitutable generic version of Copaxone, a drug indicated for the treatment of multiple sclerosis.

f.  In or around the week of August 21, 2017, the FDA conducted inspections at a Mylan facility. RAYAPUREDDY, in his role as CIO, requested and received updates from the IT Department on the status of the FDA's inspection at the Mylan facility.

g. In or around September 2017, RAYAPUREDDY became aware, through his position at Mylan, that Mylan anticipated the FDA would approve Mylan's ANDAs for Glatiramer Acetate Injections. RAYAPUREDDY, expecting the announcement to have a positive impact on Mylan's stock price, tipped Mallu both in person and by phone so that Mallu could trade on the material non-public information. Mallu told RAYAPUREDDY that he would buy some options.

h. On or about September 27, 2017, and on or about September 29, 2017, RAYAPUREDDY spoke with Mallu by phone about the anticipated FDA approval.

i. On or about September 29, 2017, Mallu purchased 1,200 Mylan call options.

j. On or about October 3, 2017, after the market closed, Mylan announced publicly that the FDA had approved Mylan's Glatiramer Acetate Injections as a generic version of Copaxone.

k. On or about October 4, 2017, after the public announcement, Mylan's stock closed at approximately $37.80, up approximately $5.27 per share (approximately 16.20%). As a result, the value of the call options that Mallu bought on September 29, 2017, increased and Mallu profited.

l. On or about October 4, 2017, RAYAPUREDDY and Mallu spoke by phone. Mallu told RAYAPUREDDY that he purchased options based on the tip, made a profit, and would compensate RAYAPUREDDY for the tip. RAYAPUREDDY

told Mallu that he was happy for Mallu and that they could discuss compensation later.

m. At RAYAPUREDDY's direction, Mallu and his agents shared the trading profits with RAYAPUREDDY or RAYAPUREDDY's designee through a cash transaction in India.

*Insider Trading Surrounding Mylan's Earnings Announcements*

n. In addition to tips regarding Mylan's FDA drug applications, RAYAPUREDDY tipped Mallu with material non-public information regarding Mylan's forthcoming earnings announcements, including regarding Mylan's anticipated February 26, 2019 earnings announcement, so that Mallu could execute profitable trades and provide RAYAPUREDDY with cash in return.

o. In or about February 2019, RAYAPUREDDY, in his position as Mylan's CIO, had knowledge of Mylan's fourth quarter and full year earnings for 2018 before Mylan publicly announced its earnings results.

p. RAYAPUREDDY told Mallu that it had been a bad quarter and a bad year for Mylan and that he expected Mylan's stock price to drop. RAYAPUREDDY tipped Mallu with this material non-public information with the expectation that Mallu would trade in Mylan securities to return a profit or avoid losses and provide RAYAPUREDDY with a benefit in return.

q. On or about February 26, 2019, Mallu used the material non-public information provided by RAYAPUREDDY to execute a series of trades in Mylan securities. Specifically, Mallu closed 1,407 pre-existing Mylan put option

contracts, seeking to avoid losing money on his existing position; he sold 5,502 Mylan call options; and he purchased 7,074 Mylan put options.

r. On or about February 26, 2019, after the market closed, Mylan announced its fourth quarter and full year earnings for 2018, along with 2019 guidance. The next day, on or about February 27, 2019, Mylan's stock price dropped.

s. In return for the unlawful tip, Mallu and his agents gave RAYAPUREDDY or RAYAPUREDDY's designee cash in India.

*Insider Trading Surrounding Mylan's Announcement of a Merger*

t. RAYAPUREDDY also tipped Mallu with material non-public information regarding Mylan's forthcoming merger announcement, so Mallu could execute profitable trades and provide RAYAPUREDDY with cash in return.

u. RAYAPUREDDY, in his role as Mylan's CIO, was privy to material non-public information regarding the merger between Mylan and Upjohn.

v. On more than one occasion, RAYAPUREDDY shared with Mallu material non-public information about the merger. RAYAPUREDDY told Mallu that he thought the merger would be good for Mylan and that he thought the news of the merger would be viewed positively. Prior to Mylan's announcement of its merger with Upjohn, RAYAPUREDDY told Mallu that Mylan's announcement would happen soon, expecting Mallu to execute profitable trades in Mylan securities based on the information and provide RAYAPUREDDY with a benefit in return. RAYAPUREDDY told Mallu that he (RAYAPUREDDY) hoped the information would help recover prior Mylan securities trading losses.

w.  From in or around July 18, 2019, through in or around July 22, 2019, Mallu used the information provided by RAYAPUREDDY to purchase 13,003 Mylan call option contracts.

x.  On or about July 29, 2019, Mylan announced that Mylan and Pfizer had entered into a definitive agreement to combine Mylan and Upjohn. Following the announcement, Mylan's stock price increased.

y.  RAYAPUREDDY and Mallu talked about the results of the trades and about how the market did not react to the news as positively as they had hoped. Nevertheless, Mallu told RAYAPUREDDY that he traded profitably and that he would try to give RAYAPUREDDY money in India after his trading activity was settled.

## Overt Acts in Furtherance of the Conspiracy

13.  In furtherance of the conspiracy and to accomplish its purpose, the following overt acts, among others, were committed in the Western District of Pennsylvania, and elsewhere:

a.  On or about September 27, 2017, RAYAPUREDDY called Mallu and provided Mallu with material non-public information regarding Mylan's application for FDA approval of a generic version of Copaxone.

b.  On or about September 29, 2017, RAYAPUREDDY and Mallu spoke again by phone regarding Mylan's application for FDA approval of a generic version of Copaxone.

c.      On or about September 29, 2017, Mallu purchased 1,200 Mylan call option contracts based on the unlawful tip from RAYAPUREDDY regarding Mylan's application for FDA approval of a generic version of Copaxone.

d.      On or about February 26, 2019, Mallu executed a series of trades in Mylan securities based on the unlawful tip from RAYAPUREDDY regarding Mylan's earnings announcement.

e.      From on or about July 18, 2019, through on or about July 22, 2019, Mallu purchased 13,003 Mylan call option contracts based on the unlawful tip from RAYAPUREDDY regarding a merger of Mylan and Upjohn.

(In violation 18 U.S.C. § 371)

## COUNTS TWO THROUGH FOUR
### (Securities Fraud)

14.     Paragraphs 1 through 13 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

15.     From at least in or around September 2017 through on or about July 29, 2019, in the Western District of Pennsylvania, and elsewhere, the defendant,

**RAMKUMAR RAYAPUREDDY,**

did knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ, and cause others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by: (a) employing, and causing others to employ, devices, schemes,

and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit: RAYAPUREDDY misappropriated material non-public information belonging to Mylan and provided that information to Mallu so that Mallu would use that information to trade in the securities of Mylan and share the proceeds with RAYAPUREDDY, including in the transactions set forth in the table below relating to Mylan's ANDAs for Glatiramer Acetate Injections, Mylan's February 26, 2019 earnings announcement, and Mylan's merger with Upjohn:

| Count | On or About Date(s) | Description of Transaction |
|---|---|---|
| 2 | September 29, 2017 | Purchase of approximately 1,200 Mylan call options |
| 3 | February 26, 2019 | Closing of approximately 1,407 Mylan put option contracts; Sale of approximately 5,502 Mylan call option contracts; Purchase of approximately 7,074 Mylan put option contracts |
| 4 | July 18, 2019 through July 22, 2019 | Purchase of approximately 13,003 Mylan call option contracts |

(In violation of 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. §§ 240.10b-5 and 240.10b5-2; and 18 U.S.C. § 2)

## FORFEITURE ALLEGATION

16. The allegations of this Indictment are hereby realleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, RAMKUMAR RAYAPUREDDY, has an interest. Upon a conviction of the offenses alleged in Counts One through Four of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to such offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

## SUBSTITUTE ASSETS PROVISION

17. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

property of the defendant up to the value of the above forfeitable property.

18. All pursuant to Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL,

_/s/_

Grand Jury Foreperson

GLENN S. LEON
Chief
Criminal Division, Fraud Section
United States Department of Justice

_/s/_

AMANDA FRETTO LINGWOOD
MATTHEW REILLY
Trial Attorneys
Market Integrity and Major Frauds Unit
Criminal Division, Fraud Section
United States Department of Justice